EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Pilar Pérez Vda. de Muñiz<br>    Apelada<br><br>    v.<br><br>Rafael Criado Amunategui; Universidad de Puerto Rico y/o Instituto de Medicina Forense de Puerto Rico, Antonio de la Cova, también conocido por Antonio González Abreu y La Crónica, Inc.<br>    Apelados | Certiorari<br><br>2000 TSPR 92 |

Número del Caso: O-85-282

Fecha: 19/junio/2000

Tribunal de Primera Instancia, Sala Superior de San Juan

Juez:  Hon. Peter Ortiz

Abogados de Antonio de la Cova:

          Lcdo. Guillermo Toledo
          Lcdo. Sergio Ramos Suárez

Abogado de Rafael Criado:

          Lcdo. Roberto De Jesús Cintrón


Abogados de Pilar Pérez:

          Lcdo. Fernando Olivero Barreto
          Lcdo. Alejandro Torres Rivera

Abogado de Asoc. Garantías de Seguros Misceláneos
en interés de la U.P.R.:

          Lcdo. Iván F. González Carmona



Materia: Daños y Perjuicios


     Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICOError! Bookmark not defined.


Pilar Pérez Vda. de Muñiz

    Demandante-Recurrida

      v.

Rafael Criado Amunategui;
Universidad de Puerto Rico        0-85-282     Apelación
y/o Instituto de Medicina
Forense de Puerto Rico,
Antonio de la Cova, también
conocido por Antonio González
Abreu y la Crónica, Inc.

    Demandados-Recurrentes


Opinión del Tribunal emitida por el Juez Presidente, señor Andréu García


      San Juan, Puerto Rico a 19 de junio de 2000


> "**Cónsono con el derecho de recibir y procurar información, expresar opiniones y diseminarlas, se encuentra el derecho a impedir la censura previa y la restricción en las publicaciones. Ni los medios, ni los periodistas deben ser discriminados por lo que escriben o dicen. La defensa de la libertad de expresión y de prensa es fundamental para la supervivencia de la democracia.**
>
> **Claro está, que la credibiidad de la prensa está inexorablmente atada al compromiso con la verdad, a la búsqueda de precisión, imparcialidad y equidad y a la clara diferenciación entre los mensajes periodísticos y los comerciales. El logro de estos fines y la observancia de los valores éticos y profesionales no deben ser impuestos. Son responsabilidad exclusiva de periodistas y medios. En una sociedad libre, la opinión pública premia o castiga." <u>Declaración de Chapultepec,</u> adoptada en México el 11 de marzo de 1994.**

La presente apelación[1] plantea una cuestión constitucional sustancial en torno a los derechos de libertad de prensa e intimidad consagrados en la Carta de Derechos de nuestra Constitución y en la Constitución Federal.

I

El 30 de abril de 1979, Carlos Muñiz Varela fue asesinado en Guaynabo. Su cadáver fue llevado al Instituto de Medicina Forense[2], donde el Dr. Rafael Criado Amunategui le practicó la autopsia. Durante el proceso se tomaron fotografías del cadáver mientras se le sometía a ciertas pruebas clínicas y de laboratorio.

Dichas fotografías, conjuntamente con los resultados de las pruebas y toda la demás información relacionada con la autopsia, formaron parte del expediente en poder del Instituto.

Posteriormente, en las ediciones de abril y julio de 1984 del Periódico La Crónica, una publicación de circulación limitada, autoidentificada con el objetivo de mantener una línea beligerante a favor de la libertad de Cuba[3], fueron publicadas algunas de las fotografías del cadáver del señor Muñiz Varela tomadas durante la autopsia. En las mismas aparece la imagen del rostro del cadáver y se observan las cicatrices ocasionadas por el acto criminoso de que fue objeto, además de las resultantes de la autopsia. Asimismo, durante el mes de mayo de 1984, en varios lugares de los Estados Unidos y Puerto Rico fue circulada otra fotografía, tomada también durante la autopsia,

---

[1] Presentada ante nos, bajo la anterior Ley de la Judicatura, que establecía, como norma general, que las sentencias finales del Tribunal Superior serían revisadas por este Tribunal mediante el recurso discrecional de revisión, excepto cuando se planteara una cuestión constitucional sustancial, en cuyo caso, serían revisadas como cuestión de derecho mediante apelación. Ley Núm. 11 de 24 de julio de 1952; Regla 53.1 de las de Procedimiento Civil de 1979. Calderón, Rosa Silva, Vargas v. García, 120 D.P.R. 803 (1988).

Con el beneficio de los alegatos de las partes, resolvemos.

[2] Hoy el Instituto de Ciencias Forenses.

[3] Edición No. 100, año 7, de abril de 1984, a la página 2 de la sección Editorial.

que muestra la cabeza del occiso atravesada de lado a lado por un instrumento médico de metal, con forma de varilla.[4]

A raíz de estas publicaciones, la viuda de Muñiz Varela, la Sra. Pilar Pérez, presentó demanda en daños y perjuicios y petición de injunction preliminar y permanente contra las siguientes personas naturales y jurídicas: el Periódico La Crónica; Antonio de la Cova, reportero del mencionado periódico; el médico que practicó la autopsia, Dr. Criado Amunategui; el Instituto de Medicina Forense; y la Universidad de Puerto Rico, entidad a la cual el Instituto estaba entonces adscrito. En síntesis, la Sra. Pérez alegó, que por su contenido, la publicación de las fotografías le causó graves angustias a sus hijos y a ella personalmente. Alegó, además, que mientras el Periódico La Crónica tuviera las fotografías en su poder, existiría la posibilidad de que volvieran a publicarlas y recurrieran los alegados daños, por lo que solicitó al tribunal que ordenara a dicho periódico **entregar al Instituto los negativos de las fotografías del cadáver del señor Muñiz Varela y prohibiera a de la Cova publicar cualquier material (fotografías o documentos) relacionado con la autopsia.** Por último, solicitó el pago de $100,000.00 en compensación por los daños y perjuicios sufridos.[5]

Atendiendo esas alegaciones, el tribunal ordenó la celebración de una vista de injunction preliminar y permanente y citó a las partes para el 3 de octubre de 1984. Comparecieron la Sra. Pérez y la codemandada, U.P.R. El codemandado, Dr. Criado Amunategui, no compareció.[6] Antes de comenzar el desfile de prueba, los representantes legales de las partes presentes informaron al Tribunal que con anterioridad a la misma se

---

[4] Dicha fotografía alegadamente fue distribuida de forma anónima utilizando el correo de Estados Unidos de América.

[5] En la demanda original, con fecha de 25 de septiembre de 1984, la demandante, Sra. Pilar Pérez, solicitó la suma de $75,000.00. Posteriormente, mediante demanda enmendada el 4 de marzo de 1985 se aumentó la suma reclamada.

[6] Se excusó a través del abogado de la U.P.R.

habían reunido y acordado estipular, para efectos de la vista de injunction,[7] lo siguiente:

1. Que los documentos que obran en el expediente del protocolo de autopsia, excepto el protocolo de autopsia, son documentos confidenciales y no tienen carácter de documento público;

2. Que los negativos de las fotografías fueron obtenidos ilegal o impropiamente y no debieron haber circulado;

3. Que del récord de la U.P.R. surge que el codemandado, señor de la Cova, tuvo acceso a, o le fueron entregados los negativos de las fotografías en cuestión (las fotografías tomadas al cadáver del señor Muñiz Varela durante la autopsia).

También discutieron algunos acuerdos entre las partes para eliminar a la U.P.R. de la petición de injunction. La Sra. Pérez informó que no interesaba que la U.P.R. consignara el expediente de la autopsia, tal y como había solicitado en la demanda, pues ésta le había suministrado copia del Informe de Autopsia. Así las cosas, el Tribunal aceptó la estipulación y ordenó la exclusión de U.P.R. de la petición de injunction. Subsiguientemente, comenzó el desfile de prueba testifical y documental. La vista se extendió hasta el día siguiente, 4 de octubre. Al finalizar, se acordó que la acción de daños seguiría su curso normal y el Tribunal (Hon. Peter Ortiz) informó que notificaría su decisión por escrito.

El 12 de marzo, dictó una Resolución y Orden resolviendo que procedía la concesión del injunction permanente, según solicitado. Ordenó al periódico La Crónica, sus funcionarios, propietarios, editores, agentes y empleados, entregar al Instituto las fotografías y documentos de autopsia que tuvieran en su poder relacionados con Muñiz Varela. En cuanto al codemandado, de la Cova, le ordenó abstenerse de distribuir, publicar, entregar y difundir cualquier información, documentos, fotografías, negativos o reproducciones obrantes en el expediente de autopsia del Instituto.

---

[7] De la Moción Informativa de la U.P.R., con fecha de 22 de octubre de 1984, surge que las estipulaciones hechas durante la vista de injunction, lo fueron solamente a los efectos de dicha vista y no en cuanto a la acción de daños y perjuicios. (A.O. pág. 50).

Oportunamente, el Periódico La Crónica y de la Cova, acudieron antes nos en recurso de Apelación y plantearon que el tribunal de instancia erró en los siguientes extremos:[8]

1.    Al aprobar una estipulación efectuada antes de comenzar la vista de injunction el 3 de octubre de 1984 entre la demandante y la Universidad de Puerto Rico en perjuicio de los co-demandados aquí apelantes quienes no fueron parte de la misma ni la consintieron y que por el contrario la objetaron oportunamente antes de comenzar la vista.

2.    Al hacer conclusiones de hecho e inferencias a base de prueba no presentada cuando se afirma que las fotografías fueron distribuidas mediante anónimos dirigidos a diferentes personas por conducto del Correo de los Estados Unidos, y cuando se infiere sin que nadie testificara o se presentara alguna prueba que el señor de la Cova  González Abreu engañó al Dr. Rafael Criado al obtener las fotografías de autopsia.

3.    Al declarar sin lugar la "Moción Solicitando Determinaciones de Hechos Adicionales" radicada por los aquí apelantes el 21 de marzo de 1985, la cual básicamente exponía toda la prueba no contradicha que se presentó en el tribunal.

4.    Al no concluir que las fotografías eran propiedad del Periódico La Crónica.

5.    Al fundamentar la Resolución y Orden del 12 de marzo de 1985 en la doctrina civilista del abuso del Derecho, la cual, no aplica al derecho constitucional ni tampoco se puede utilizar cuando hay derechos en conflicto.

6.    Al ordenarle al Periódico La Crónica devolver negativos y reproducciones de fotografías de autopsia previamente publicadas en dicho periódico, lo que equivale a prohibirle indirectamente su publicación, a pesar de estar relacionadas dichas fotos con un suceso considerado noticia y de sumo interés público y en el cual estaba envuelta una figura pública, el occiso Carlos Muñiz Varela y la propia demandante quien es a su vez figura pública, siendo esto una censura previa y un ataque directo a la libertad de prensa, en violación a la Primera Enmienda de la Constitución de los Estados Unidos de América y al Artículo II, Sección 4 de la Constitución del Estado Libre Asociado de Puerto Rico.

7.    Al prohibirle al co-demandado Antonio de la Cova González Abreu, distribuir, publicar, entregar y difundir información, documentos, fotografías, negativos o reproducciones del expediente de autopsia del occiso Carlos Muñiz Varela, constituyendo esto un ataque a la libertad de expresión en violación a la Primera Enmienda de la Constitución de los Estados Unidos de América y al Artículo II, Sección 4 de la Constitución del Estado Libre Asociado de Puerto Rico.

8.    Al no reconocer la preeminencia del derecho constitucional de la libertad de prensa y expresión sobre el derecho constitucional a la privacidad que fue voluntaria e inteligentemente renunciado tanto

---

[8] Dividieron sus señalamientos en dos renglones, a saber, errores no constitucionales y errores constitucionales.

por el occiso como por la demandante al adoptar ambos roles en la sociedad de figuras públicas.

II

En atención a la importancia del planteamiento sobre la procedencia del remedio de un _injunction_ contra una publicación amparada bajo el derecho constitucional a la libertad de prensa, procede su evaluación inicial antes de abordar cualquier otro señalamiento de error.

La orden de _injunction_ **expresamente le prohíbe al reportero del periódico La Crónica** publicar las mencionadas fotografías del cadáver de Muñiz Varela. Aun cuando no fue dirigida al periódico, el efecto de la misma resulta en una prohibición a la libertad del periódico para decidir el material que publica.[9] Con este trasfondo examinemos la validez de este remedio, lo cual implica, en síntesis, decidir si un tribunal puede prohibirle a la prensa, mediante _injunction_, publicar ciertas fotografías por considerar que violentan el derecho a la intimidad de algunas personas.

Nuestra Constitución y la federal sitúan la libertad de prensa como derecho fundamental.[10] Méndez Arocho v. El Vocero, 130 D.P.R. 867 (1992); El Vocero v. E.L.A., 131 D.P.R. 356 (1992); _supra_; Pueblo v. Arandes de

---

[9] Surge de los autos del caso que, a pesar de que inicialmente el remedio de _injunction_ se solicitó también contra el Periódico La Crónica, la parte demandante con la anuencia de la parte demandada enmendó esa parte de la súplica de su demanda para desistir de la petición de que se le prohibiera al periódico volver a publicar las fotos en controversia. Véase moción con fecha de 4 de octubre de 1984 presentada por los demandantes-apelados (a la página 25 del expediente del caso) y Exposición Narrativa de la Prueba con fecha de 26 de septiembre de 1985 (a la página 329 de los autos).


[10] El Art. II Sec. 4 de nuestra Constitución lee:

"No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios."

La Primera Enmienda de la Constitución de los Estados Unidos reza:

"El Congreso no aprobará ninguna ley con respecto al establecimiento de religión alguna, o que prohiba el libre ejercicio de la misma o que coarte la libertad de palabra o de prensa; o el derecho el pueblo a reunirse pacíficamente y a solicitar del Gobierno la reparación de agravios".

Celis, 120 D.P.R. 530 (1988); Santiago v. Bobb y El Mundo, Inc., 117 D.P.R. 153 (1986); Soto v. Secretario de Justicia, 112 D.P.R. 477 (1982); Aponte Martínez v. Lugo, 100 D.P.R. 282 (1971). Su esencia estriba en impedir la restricción arbitraria del contenido de publicaciones, así como el medio, lugar y manera en que se realicen, no importa su veracidad, popularidad o simpatía. Coss v. C.E.E., res. en 8 de febrero de 1995, 137 D.P.R. ----; Aponte Martínez v. Lugo, supra. "Si la garantía constitucional significa algo, es, al menos de ordinario, que el gobierno no tiene la facultad de restringir la expresión a base de su mensaje, ideas, objetivos o contenido" Tribe, American Constitutional Law, second edition, 1988, pág. 790 (traducción nuestra, citas omitidas). Conlleva la libertad de los periódicos para decidir lo que quieren imprimir y la protección al público de recibir la información tal y como es publicada. Disidente Universal de Puerto Rico, Inc. v. Departamento de Estado, 98 TSPR 68, res. en 12 de junio de 1998. "La libertad de expresión es la condición indispensable de casi cualquier otra forma de libertad", expresó el Juez Cardoso en Palko v. Connecticut, 302 U.S. 319 (1937).

Precisamente, en Aponte Martínez v. Lugo, supra, tuvimos la oportunidad de enfrentarnos a una solicitud de injunction (entredicho provisional), para impedir la publicación de una carta-informe con ciertos datos sobre el manejo de las propiedades de una organización religiosa. En esa ocasión, recapitulando anteriores pronunciamientos de este Tribunal y del Supremo Federal, recalcamos la importancia del derecho a la libertad de prensa en nuestra sociedad. Allí, recordamos que las libertades de palabra de prensa y de reunión en asamblea "son vitales, para la existencia misma de la democracia". Pueblo v. Burgos, 75 D.P.R. 551, 570 (1953). Expresamos, además, que "las garantías de nuestra Carta de Derechos las interpretamos y las hacemos efectivas "no en menor grado de protección" que lo hace, respecto a garantías similares, el Tribunal Supremo de los Estados Unidos. R.C.A. v.

*Gobierno de la Capital*, 91 D.P.R. 416, 427, (1964)." *Aponte Martínez* v. *Lugo*, *supra*, 286.

En una serie de casos, el Tribunal Supremo de los Estados Unidos ha rechazado y desacreditado consistentemente las tentativas de censura previa, especialmente las que se han pretendido llevar a cabo mediante *injunctions*. Según explicamos en *Aponte Martínez*, *supra*, los dos casos más notables de esa casuistica son *Near v. Minnesota*, 283 U.S. 697 (1931) y *New York Times Co. v. United States*, 403 U.S. 713 (1971). El primero, por el valor intrínseco de la opinión del Tribunal y el segundo por la importancia del asunto, ya que el gobierno invocó, aunque sin éxito, el casi siempre avasallador argumento de la seguridad militar nacional. En ambos se trató de prohibir de antemano mediante interdicto la publicación de material escrito. En *Aponte Martínez* v. *Lugo*, *supra*, a la pág. 288, resumimos así lo resuelto por el más alto foro federal:

> "En *Near*, *supra*, se obtuvo, como dijimos, un interdicto para prohibir la publicación de un escrito en un periódico por considerarse dicho material 'malicioso, escandaloso y difamatorio'. Del caso surge, que, en efecto, con toda probabilidad dicho material era malicioso, escandaloso y difamatorio. En una opinión extraordinaria, escrita por el entonces Juez Presidente Charles Evans Hughes, con los votos a favor, entre otros, de los Jueces Holmes, Brandeis y Stone, el Tribunal anuló el interdicto y permitió la publicación. Luego de señalar que lo que se trataba de hacer vía injunction constituía la esencia de 'la censura previa' (283 U.S. a la pág. 713), el Tribunal recordó que el propósito principal de la garantía constitucional de libertad de prensa es precisamente prohibir esa clase de censura."

Explicamos también en *Aponte Martínez*, *supra*, que, conforme al Tribunal Supremo Federal "el ejercicio de la libertad de palabra y de prensa no depende de que lo que se diga o publique sea cierto y que tampoco puede coartarse dicha libertad en aras de evitar un escándalo (283 U.S. a la pág. 721 y pág. 722). Allí se explicó que la libertad de prensa es esencial para la vida de un país libre y que esa libertad consiste en que no se le imponga censura previa a las publicaciones. 283 U.S. a la pág. 713."

También en *Aponte Martínez*, *supra*, explicamos y aplicamos *Murdock v. Pennsylvannia*, 319 U.S. 105. Allí se intentó suprimir la publicación de

cierta literatura alegadamente mortificante sobre asuntos religiosos. El Tribunal expresó que no hay derecho a prohibir la publicación de ideas porque éstas sean impopulares, mortificantes o desagradables.

"El Tribunal Supremo de los Estados Unidos ha sostenido en forma clara y terminante  la libertad de palabra y de prensa y ha señalado que dichas libertades se garantizan y se garantizarán por los tribunales especialmente cuando se trata de suprimir publicaciones o ideas que en un momento dado resulten impopulares u odiosas. Murdock v. Pennsylvannia, supra [...] Difícilmente nadie ha de ser perseguido por repetir los lugares comunes de cada época. La protección constitucional tiene el propósito de proteger tanto la publicación de esos lugares comunes como la de ideas nuevas o minoritarias. Una sola conciencia que disienta tiene derecho a expresarse[...]" Aponte Martínez v. Lugo, supra, a la pág. 289.

Desde luego, la libertad de expresión está sujeta a algunas excepciones, aunque éstas, a la luz de la más reciente jurisprudencia, cada vez son menos. Aponte Martínez v. Lugo, supra.

Hasta ahora, en sólo tres circunstancias específicas los tribunales han permitido que se prohíba la publicación de determinada información, a saber:

>"Cuando una nación está en guerra, muchas cosas que podrían ser dichas en tiempo de paz son un estorbo tal a su esfuerzo que su expresión no puede tolerarse en tanto haya hombres [sic] luchando y ningún tribunal habrá de considerarlas protegidas por derecho constitucional alguno [...] Por similares fundamentos, los requisitos fundamentales de la decencia pueden hacerse valer contra publicaciones obscenas. La seguridad de la vida comunitaria puede protegerse contra exhortaciones a actos de violencia y al derrocamiento por la fuerza del gobierno ordenado. Las garantías constitucionales de la libertad de expresión no 'protegen a un hombre [sic] de un interdicto contra el pronunciamiento de palabras que podrían tener el efecto completo de la fuerza. Gompers v. Buck Stove & Range Co., 221 U.S. 418 (1911), 439.' Schenck v. United States, 249 U.S. 47 (1919), 47." (Traducción nuestra.)

Según explicamos en Aponte Martínez, supra, toda tentativa de censura previa llega al tribunal acompañada de una fuerte presunción de inconstitucionalidad. Citando el Informe de la Comisión de Carta de Derechos a la Convención Constituyente de Puerto Rico, indicamos:

"Esta sección [la sección 4 de nuestra Carta de Derechos] corresponde a las restantes disposiciones de la enmienda primera en la Constitución federal e incorpora a nuestra Constitución todo el derecho históricamente establecido con relación a la libertad de palabra, de prensa, de reunión y de petición. Las secciones 3 y 4 cubren el ámbito general de la libertad de conciencia, de pensamiento, de expresión y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de estos derechos."

### III

De otra parte, nuestra jurisprudencia, ciertamente, ha considerado que el derecho a la intimidad goza de enorme valoración en nuestro ordenamiento constitucional. Su protección puede generar conflictos con otras garantías constitucionales. En E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436, 446 (1975), abordamos el dilema y planteamos la metodología a seguir en dichas situaciones.

"Lo expuesto hasta ahora, sin embargo, no resuelve de por sí la cuestión específica ante nos. Lo que indica es que el derecho a la intimidad goza de un altísimo sitial en nuestra escala de valores, pero lo mismo puede decirse ciertamente del derecho a la libre expresión y de otras libertades. Véanse: Mari Bras v. Casañas, 96 D.P.R. 15 (1968); Aponte Martínez v. Lugo, 100 D.P.R. 282 (1971). En muchas situaciones el derecho a la protección de la vida privada o familiar debe prevalecer sobre dichas libertades. **En otras puede ocurrir a la inversa**. Analicemos la situación concreta a que nos enfrentamos en esta instancia." (Énfasis suplido)

También en Colón v. Romero Barceló, 112 D.P.R. 573 (1982) pudimos expresarnos sobre el balance de derechos que hoy revistamos. Allí tratábamos el conflicto entre el derecho a la intimidad y la libertad de expresión. Concluimos que la expresión política de un candidato a una elección general estaba limitada por el derecho a la intimidad y la honra de los familiares de un difunto cuya fotografía figuraba en unos anuncios de campaña. Pero también mencionamos posibles excepciones a la regla allí sentada al distinguir aquel caso de uno anterior.

"Lo primero que notamos es que García Cruz v. El Mundo, Inc., 108 D.P.R. 174 (1978), no es aplicable a los hechos de este caso toda vez que **(1) no se trata de una publicación hecha en ejercicio de la libertad de prensa y sí para promover una propuesta sumida en una controversia política**; (2) el asesinato de una persona no convierte a ésta, ni a sus familiares, en figuras públicas dentro del alcance de dicha decisión; y (3) no se trata aquí de una publicación libelosa y sí de una publicación que pudo afectar el derecho de los demandantes a

que no se lesionara su intimidad ni se abusara de sus sentimientos." Colón v. Romero Barceló, supra, a la pág 582. (Énfasis suplido)

A la luz de esta jurisprudencia, entendemos que el derecho a la intimidad —aunque abarcador y relevante, e.g. a la hora de conceder compensación por daños producidos por una publicación —, no justifica la imposición de censura previa, máxima manifestación de la violación a la libertad de prensa.

No cabe duda que las fotografías en el caso de autos, cuya publicación fue prohibida por el tribunal de instancia, ciertamente contienen imágenes desagradables, grotescas, morbosas e impactantes a nuestra sensibilidad humana. No obstante, en la medida en que el injunction implica una censura permanente, conflige con nuestra misión de preservar la libertad de prensa. Más allá de nuestra reacción y rechazo al uso insensible de este tipo de fotografía, estamos compelidos a aplicar las normas de derecho antes esbozadas y eliminar cualquier remedio judicial que tienda a socavar las bases de este derecho constitucional. "El precio de la libertad es la eterna vigilancia." Aponte Martínez v. Lugo, supra.

IV

De otra parte, independientemente del efecto que el injunction dictado tiene sobre el derecho a la libertad de prensa, existen otras razones en derecho para anularlo. Consistentemente hemos reiterado que el injunction, por su naturaleza de recurso extraordinario, se expide con carácter discrecional y mientras exista algún remedio eficaz, completo y adecuado en ley, no se considera el daño como irreparable. Martínez v. P.R. Ry. Light & Power Co., 18 D.P.R. 725 (1912); Franco v. Oppenheimer, 40 D.P.R. 153 (1929); A.P.P.R. v. Tribunal Superior, 103 D.P.R. 903 (1975). Al evaluar la procedencia de un injunction preliminar deben evaluarse los siguientes criterios: 1) la naturaleza de los daños que pueden ocasionarse a las partes de concederse o denegarse; 2) la irreparabilidad del daño o la existencia de un remedio adecuado en ley; 3) la probabilidad de que la parte promovente prevalezca eventualmente al

resolverse el litigio en su fondo; 4) la probabilidad de que la causa se torne académica de no concederse el injunction; y 5) el impacto sobre el interés público del remedio que se solicita. P.R. Telephone Co. v. Tribunal Superior, 103 D.P.R. 200, 202 (1975); Mun. de Ponce v. Gobernador I, 136 D.P.R. 776 (1994).[11] Por razón del origen del injunction en las Cortes de Equidad inglesas, el principio de equidad que gobierna su concesión o denegación exige que la parte promovente demuestre la ausencia de un remedio adecuado en ley. Se estiman como remedios legales adecuados aquéllos que pueden otorgarse en una acción por daños y perjuicios, en una criminal o cualquiera otra disponible. Con relación a este remedio en equidad, constituye, por tanto, un daño irreparable aquél que no puede ser adecuadamente satisfecho mediante la utilización de los remedios legales disponibles. Misión Industrial de P.R. v. Junta de Planificación, res. en 21 de mayo de 1997, 143 D.P.R. ____. Por lo tanto, antes de expedir un injunction, ya sea preliminar o permanente, el tribunal debe tomar en consideración la existencia o ausencia de algún otro remedio adecuado en ley que evite la expedición del injunction.

En el caso que nos ocupa la demandante, Sra. Pilar Pérez, tiene la opción de ser indemnizada en daños y perjuicios por responsabilidad extracontractual al amparo del Art. 1802 del Código Civil. Si bien en este caso puede aplicar alguno de los criterios que hemos establecido para la procedencia de un injunction, lo cierto es que existe otro remedio apropiado que evitaría restringir el derecho a la libertad de prensa. Si en su día ella prueba los elementos de una causa de acción bajo el Art. 1802, podría ser indemnizada por sus daños y, además, esa

---

[11] En cuanto a los factores que deben tomarse en consideración para emitir un recurso de injunction permanente son: 1) si el demandante ha prevalecido en un juicio en sus méritos; 2) si el demandante posee algún remedio adecuado en ley; 3) el interés público envuelto y; 4) el balance de equidades. State Ex. Rel. Guste v. Lee, 635 F. Supp. 1107, 1125 (1986) [citado por la Juez Asociada, Hon. Miriam Naveira de Rodón en su Voto particular y de conformidad, en Universidad del Turabo v. Liga Atlética Interuniversitaria, 126 D.P.R. 497, 505 (1990)].

acción podría constituir un disuasivo de la conducta que a través del injunction se pretendía detener.

Precisamente, en Colón v. Romero Barceló, supra, resolvimos que nuestra evolución doctrinaria en materia de daños enmarca una conducta constitutiva de violación al derecho a la intimidad. Nuestra jurisprudencia ha reconocido que el concepto de culpa del Art. 1802 es tan infinitamente amplio como la conducta de los seres humanos e incluye cualquier falta de una persona que produce un mal o un daño. Gierbolini v. Employer Fire Ins. Co., 104 D.P.R. 853 (1976); Reyes v. Sucesión Sánchez Soto, 98 D.P.R. 305 (1970). La aplicación de esta norma a un periódico por la publicación de fotografías que puedan constituir una invasión al derecho a la intimidad de una persona no tiene más efecto disuasivo que el que tiene la conciencia de los seres humanos, que es, en última instancia, la que nos hace responsable ante los demás.

La demandante, Sra. Pilar Pérez, tiene aún pendiente su reclamación ordinaria de compensación por daños y perjuicios alegadamente sufridos a raíz de la publicación de las mencionadas fotografías. Este reclamo persiste, dado a que se paralizó su trámite en tanto se resolvía la procedencia del injunction dictado por Instancia. Procederá entonces, resuelta esta controversia interlocutoria, que ese foro considere la prueba pertinente a la causa de acción por daños al amparo del Art. 1802 del Código Civil y emita el dictamen final que proceda a esos efectos. No debe entenderse que lo que hoy resolvemos prejuzga parcial o totalmente la referida causa de acción.

Por el resultado al cual hemos llegado no es necesario considerar los demás señalamientos. Éstos se referían mayormente a los fundamentos utilizados por el tribunal de instancia para sostener la concesión del injunction. Reiteradamente hemos explicado que la revisión de una sentencia se da contra su resultado, no contra sus fundamentos. Pagán v. Alcalde Mun. Cataño, res. en 30 de mayo de 1997, 143 D.P.R. ___; Piñeiro v. Int I Air Serv. Of P.R. Inc., res. en 18 de marzo de 1996, 140 D.P.R.

___; Vélez Rodríguez v. Amaro Cora, res. en 10 de abril de 1995, 138 D.P.R._, entre otros.

Por los fundamentos expuestos, se dictará sentencia dejando sin efecto el injunction decretado en este caso. Se devuelve el mismo al Tribunal de Primera Instancia para la continuación de los procedimientos ulteriores consistentes con estos pronunciamientos.


José A. Andréu García
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO**Error! Bookmark not defined.**

Pilar Pérez Vda. de Muñiz

    Demandante-Recurrida

       v.

Rafael Criado Amunategui;
Universidad de Puerto Rico        0-85-282      Apelación
y/o Instituto de Medicina
Forense de Puerto Rico,
Antonio de la Cova, también
conocido por Antonio González
Abreu y la Crónica, Inc.

    Demandados-Recurrentes

SENTENCIA

San Juan, Puerto Rico, a 19 de junio de 2000

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente, se dicta sentencia dejando sin efecto el injunction decretado en este caso. Se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos ulteriores consistentes con estos pronunciamientos.

Lo pronunció y manda el Tribunal y certifica la Secretaria de Tribunal Supremo. El Juez Asociado señor Rebollo López disiente sin opinión escrita, haciendo constar que entiende, entre otras razones, que el presente caso se ha tornado académico, razón por la cual procede que se decrete el archivo y sobreseimiento del mismo. La Jueza Asociada señora Naveira de Rodón disiente sin opinión escrita. El Juez Asociado señor Fuster Berlingeri disiente con opinión escrita.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Pilar Pérez Vda. de Muñiz

    Apelada

        vs.                O-1985-282      Certiorari

Rafael Criado Amunategui, Etc.

    Apelantes

Opinión Disidente emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 19 de junio de 2000.

En el caso de autos, una mayoría del Tribunal, supuestamente al amparo de la libertad de prensa, decreta que no procede que se dicte un injunction para prohibir que se continúen publicando las grotescas fotografías de un cadáver, obtenidas ilícitamente del expediente confidencial de una autopsia, que ya antes se habían divulgado varias veces.

Disiento de este dictamen no sólo por ser contrario a las claras normas de nuestro derecho constitucional que son aplicables, sino además, porque en este caso **no existe realmente una cuestión de libertad de prensa**. Más aun, la mayoría opta por emitir su dictamen mediante una opinión

para sentar así un precedente a pesar de que el caso de autos, que fue presentado ante nos **hace quince años**, trata de una situación de hechos **única y excepcional** que además **se ha desvanecido**, por lo que no amerita que este Foro use aquí su autoridad para fijar pautas constitucionales. Veamos.

I

Para colocar los fundamentos jurídicos de este disenso en su perspectiva propia, es menester precisar algunos hechos del caso de autos, **que no se narran en detalle en la opinión de la mayoría**.

La recurrente, La Crónica, era una publicación muy ocasional de unas personas, que se distribuía gratuitamente a un grupo limitado de lectores. No tenía oficinas y su redacción se hacía en la residencia de los que la editaban. **No hay evidencia de que dicha publicación exista en la actualidad**.[12]

En su edición de **abril de 1984**, La Crónica publicó en su primera página un retrato del cadáver de Carlos Muñiz Varela tomada cuando se le hizo la autopsia. El grotesco retrato ocupaba una cuarta parte de dicha primera página y aparecía bajo un titular que leía así: "Droga, Sexo y Mafia En Muerte de Muñiz". En el interior de esa misma edición de la publicación, aparecen de modo prominente otras dos fotos del cadáver de Muñiz Varela, aun más grotescas que la anterior. Estas fotografías están acompañadas de un extenso artículo sobre supuestas actividades de Muñiz Varela, en el cual se especula que el alegado "agente castrista" fue asesinado por haber estado relacionado al narcotráfico de Cuba o por aventuras amorosas.

En mayo de 1984, una cuarta fotografía, aun más macabra y morbosa que las anteriores, según lo determinó el foro de instancia, circuló en Puerto Rico y Estados Unidos. Fue distribuida mediante anónimos enviados a diferentes personas por medio del correo.

---

[12] **Nuestra investigación en las principales bibliotecas del país y en otros lugares no ha resultado en evidencia alguna de que dicha publicación existe aún o que haya existido en los últimos años**. Cabe preguntarse, pues, si este caso no se ha tornado **académico**.

Semanas más tarde, en otra edición de La Crónica, se volvió a publicar una de las fotografías que había aparecido antes en la edición de abril. Esta foto acompañaba a un artículo en el cual se hacía burla de un programa radial de Puerto Rico en el que el Lic. Graciani Miranda Marchand, Ana Palés y el legislador Justo Méndez se lamentaron de que no se hubiese esclarecido aún quién fue el autor de la muerte de Muñiz Varela.

Todas las fotografías aludidas formaban parte del protocolo de la autopsia de Muñiz Varela. El foro de instancia, a base de una estipulación de las partes, determinó que todas las fotos referidas eran **documentos confidenciales**, que fueron obtenidos **ilícitamente**.

A la luz de estos hechos, y los otros que se narran en la opinión de la mayoría, veamos si procedía en derecho el injunction solicitado por la viuda de Muñiz Varela, ordenando que se devolviesen al Instituto de Medicina Forense las fotografías obtenidas ilegalmente y prohibiendo que se volvieran a distribuir o publicar, que fue concedido por el foro de instancia.

II

A. **La cuestión de la censura previa**

Es evidente que **no** tenemos ante nos la situación típica u ordinaria de **censura previa** a la que hemos aludido en nuestra jurisprudencia y que la mayoría cita en su opinión. Ello, por varias razones. En primer lugar, con el injunction en cuestión no se pretendía prohibir **la discusión de asunto o tema alguno**. No se perseguía evitar de modo alguno la publicación de información de interés público ni la divulgación de ideas. No se buscaba siquiera vedar la publicación de fotografías corrientes de Muñiz Varela. Sólo se pretendía prohibir **el continuado uso** de unas fotografías **muy particulares**, obtenidas **ilícitamente**, en las cuales sólo aparece **el macabro semblante de un cadáver desfigurado por heridas lacerantes y por las cicatrices que resultaron de la autopsia**.

Es difícil entender cuál es el interés público legítimo que pueda

haber en continuar con la publicación de las fotografías en cuestión, que justifique la decisión de la mayoría en este caso. Continuar publicando las fotos referidas sólo puede responder a un interés morboso en divulgar la imagen de un cadáver macabro o, lo que es peor, al deseo de denigrar crudamente la memoria del fallecido. La libertad de prensa no protege tales intereses. La prueba más clara de que las fotos referidas no tenían relación alguna con los intereses que protege la libertad de prensa es que los propios artículos que <u>La Crónica</u> publicó junto con las fotos referidas **no aludían a dichas fotos de modo alguno**. Los artículos trataban sobre las actividades de Muñiz Varela, sobre las especulaciones en cuanto a por qué lo asesinaron, y sobre diversas reacciones a la inconclusa investigación del delito. Dichos artículos no tenían nada que ver con el cadáver grotescamente desfigurado de Muñiz Varela, que es lo que aparece retratado. Los artículos en cuestión se pudieron haber publicado con igual eficacia sin las fotos referidas o usando fotos de Muñiz Varela cuando éste vivía, **tal como lo hicieron varios periódicos del país** que también informaron sobre el asesinato de Muñiz Varela y discutieron el asunto, sin publicar las grotescas fotos en cuestión.

Por otro lado, debe resaltarse que aún la consecución del interés morboso o del deseo de denigrar, aludidos antes, ya se había logrado. **La fotos referidas se publicaron varias veces**. Lo único que está en cuestión en este caso es **si dichas fotos se podían seguir publicando**. No se trató de impedir su publicación original, que es lo que sucede de ordinario en casos de censura previa. Tampoco se intentó impedir otras publicaciones posteriores de dichas fotos. En efecto, las fotos referidas tuvieron amplia difusión.

Es obvio, pues, que **no existe realmente en este caso ninguna cuestión de libertad de prensa**. El injunction solicitado no va dirigido a restringir ninguno de los importantes derechos que esa libertad fundamental cobija legítimamente. Va dirigido solamente a impedir que se continúe con el avieso afán de denigrar de modo ruin la memoria del fallecido, que no es de modo alguno un propósito que pueda ampararse bajo

la libertad de prensa. Resolver, como lo hace la mayoría en su opinión, que tal siniestro propósito está protegido por la libertad de prensa constituye una distorsionada aplicación de esa libertad, que sólo puede resultar en su desdoro. La mejor manera que este Foro tiene de proteger esa fundamental libertad es hacerla valer contra los errados intentos de obstaculizarla, que algunos en el poder público han puesto de moda. No se protege extendiendo su alcance a situaciones en las que se ha abusado crudamente de esa libertad.

**B.** **El derecho a la intimidad**

Desde hace ya varias décadas hemos resuelto que el derecho a la intimidad goza de un altísimo sitial en nuestra escala de valores jurídicos. Tan alto es ese sitial que hemos resuelto expresamente que en ocasiones **"el derecho a la protección de la vida privada o familiar debe prevalecer sobre [la libre expresión y otras libertades"]**, E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436 (1975), a la pág. 446.

Hace unos años tuvimos ante nos una situación que en lo esencial es pertinente a la que nos concierne ahora. En Colón v. Romero Barceló, 112 D.P.R. 573 (1982), examinamos la acción de la viuda y los hijos de un fallecido, que demandaron porque un grupo político había difundido por la televisión un anuncio que presentaba precisamente una grotesca foto del cadáver del fallecido. Determinamos entonces que el mensaje que querían comunicar los que difundieron la foto en cuestión podía divulgarse de otra forma, sin tener que utilizar dicha foto. Señalamos que **"la inclusión de la fotografía objetada no era esencial para comunicar [el mensaje]"**. Colón v. Romero Barceló, supra, a la pág. 582. Reconocimos allí, además la primacía del derecho a la intimidad de los familiares del fallecido. Resolvimos expresamente que al sopesar los derechos constitucionales reclamados respectivamente por las partes del caso, el derecho a la intimidad de los parientes del fallecido era **"de superior jerarquía a la libertad de expresión"** del grupo político. Id.

En el caso de autos, también debe hacerse valer el derecho a la

intimidad, sobre todo frente a la ausencia de un interés público auténtico en la continuada divulgación de las fotografías en cuestión. Nada aportaba al debate vigoroso sobre cuestiones de interés público la continuada publicación de las fotografías aludidas. En cambio, es incuestionable la angustia y la humillación que le causó a los familiares de Muñiz Varela la publicación de varias fotografías en las cuales aparece el cadáver de éste, con su cabeza agujerada, y atravesada de lado a lado por un instrumento de acero. Por ello, el foro de instancia formuló la siguiente determinación:

> **"Vamos a las fotografías. Son tan grotescas que no podemos ni intentar describirlas. Ni aún en un proceso penal el ministerio público intentaría ofrecerlas en evidencia.**
>
> **...Dada la tesis editorial del periódico o panfleto La Crónica, no tenemos duda de que el único propósito al publicarlas fue herir la sensibilidad de la demandante, sus familiares y allegados y todo aquel que no comulgue con las ideas políticas de los editores. Es inconcebible que su publicación sirva para llevar un mensaje positivo. En nada ayuda a la causa del periódico."**

Es evidente que el interés en continuar publicando las fotografías en cuestión sólo podía responder a **<u>la aviesa intención de desacreditar de modo ruin la memoria del occiso</u>**, que no es un interés público legítimo protegido por la libertad de prensa. El logro de tal intención habría de lastimar seriamente aún más los sentimientos de los parientes de éste y la honra de su familia.

En una sociedad como la nuestra, en la cual el respeto y la reverencia por las personas fallecidas están hondamente arraigados, no puede negarse que la publicación de las fotografías en cuestión atentaba contra sensibilidades muy especiales, relativas a la vida privada y familiar, que están protegidas por el derecho a la intimidad. El dictamen de la mayoría en este caso relega estos importantes valores jurídicos y culturales nuestros, en aras de proteger una supuesta libertad de prensa que realmente no cobija la situación ante nos, y que ciertamente no ampara abusos tan patentes como el que está presente en este caso.

## C.   **Los límites de los derechos fundamentales**

Insistimos en que en el caso de autos no se configura una situación o controversia que atente contra la libertad de prensa. No obstante, si ello no fuese así, entonces sería menester tomar en cuenta que reiteradamente hemos resuelto que el ejercicio de los derechos constitucionales no goza de una protección totalmente irrestricta. **Ni siquiera los fundamentales derechos de expresión son absolutos**. Su plena vigencia presupone que no se abusará de estos derechos; que serán ejercitados respetándose los derechos esenciales de otras personas y los intereses apremiantes de la colectividad, como corresponde en un sistema de libertad ordenada como es el nuestro. Véanse: Velázquez Pagán v. A.M.A., 131 D.P.R. 568 (1992); Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229 (1988); Maldonado y Negrón v. Marrero Blanco, 121 D.P.R. 705 (1988); Pueblo v. Hernández Colón, 118 D.P.R. 891 (1987); López Vives v. Policía de P.R., 118 D.P.R. 219 (1987); Santiago v. Bobb y El Mundo, Inc., 117 D.P.R. 153 (1986); Pueblo v. Santos Vegas, 115 D.P.R. 818 (1984); Sánchez Carambot v. Dir. Col. Univ. Humacao, 113 D.P.R. 153 (1982); Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982); Pueblo v. Turner Goodman, 110 D.P.R. 734 (1981); Agostini Pascual v. Iglesia Católica, 109 D.P.R. 172 (1979); Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251 (1979); Pierson Muller II v. Feijo, 108 D.P.R. 261 (1978); Herminia González v. Srio. del Trabajo, 107 D.P.R. 667 (1978); Democratic Party v. Tribunal Electoral, 107 D.P.R. 1 (1978); E.L.A. v. Hermandad de Empleados, supra; Sucn. de Victoria v. Iglesia Pentecostal, 102 D.P.R. 20 (1974); Aponte Martínez v. Lugo, 100 D.P.R. 282 (1971); Mari Brás v. Casaña, 96 D.P.R. 15 (1968).

Como corolario del principio anterior, hemos reconocido también la necesidad de poner en balance y armonizar determinados derechos constitucionales cuando estos confligen. Lo señalamos claramente en E.L.A. v. Hermandad de Empleados, supra, a la pág. 437:

"Los derechos... de los seres humanos no constituyen

usualmente imperios de fronteras precisas e inmutables. Chocan a menudo entre sí, por el contrario, e importa definir sus lindes y efectuar acomodos, situación a situación, conforme a los postulados y valores de una sociedad cambiante."

A pesar de la conocida doctrina constitucional encarnada en la jurisprudencia citada en los párrafos anteriores, la mayoría en el caso de autos trata a la supuesta libertad de prensa alegada aquí como si fuera un derecho absoluto. Se le da vigencia irrestricta a la libertad alegada, sin que cuenten para nada las **circunstancias particularísimas** de este caso, que lo convierten en uno muy **excepcional**. Se reconoce un derecho a la continuada publicación de unas fotografías grotescas y morbosas sin que importe que éstas se obtuvieron ilícitamente; sin que importe que con su repetida publicación antes, ya se había agotado cualquier interés público legítimo que tuviese la divulgación de éstas; y sobre todo, sin que importe el también fundamental derecho a la intimidad que le asiste a los familiares del muerto. No creo que esta protección extrema de la supuesta libertad de prensa alegada tenga fundamento adecuado y válido en nuestro ordenamiento constitucional.

                              III

Tampoco logro comprender por qué una mayoría del Tribunal decide plasmar su errónea decisión en una **opinión** de este Foro, con todo lo que ello significa. La norma habitual que seguimos cotidianamente al ejercer la función de pautar el Derecho en Puerto Rico presupone que el asunto ante nos sea de suficiente interés público. **No emitimos opiniones cuando se trata de situaciones únicas**, como la de este caso, sobre todo cuando parece evidente que el caso en sí se ha tornado **académico** porque la entidad demandada, La Crónica, ha desaparecido. **¿Qué razón de auténtico interés público, pues, motiva a la mayoría ha emitir su dictamen vía opinión en este caso, que ha estado pendiente por quince años?** La desconozco.

                              IV

Por todas las razones expresadas antes, disiento.

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO