ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| MUNICIPIO AUTÓNOMO DE CAGUAS – OFICINA DE PERMISOS<br><br>Parte Apelante<br><br>v.<br><br>OILTEC ECO LOGISTIC<br><br>Parte Apelada | KLAN202400617 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de Caguas<br><br>Caso Núm.: CG2024CV00355<br><br>Sala: 801<br><br>Sobre: Injunction (Entredicho Provisional, Injunction Preliminar y Permanente) |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a, 26 de agosto de 2024.

Compareció ante este Tribunal la parte apelante, el Municipio Autónomo de Caguas (en adelante, el "MAC" o el "Apelante"), mediante recurso de apelación presentado el 24 de junio de 2024. Nos solicitó la revocación de la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala Superior de Caguas (en adelante, el "TPI"), el 18 de abril de 2024 y notificada en igual fecha. Mediante dicho dictamen, el foro de instancia declaró "No Ha Lugar" la "**Demanda**" presentada por el Apelante y, en su consecuencia, desestimó la misma. El 30 de abril de 2024, el MAC presentó una "**Solicitud Determinaciones de Hechos Adicionales y de Reconsideración**" que fue denegada por el TPI mediante *Resolución* de 24 de mayo de 2024.

Por los fundamentos que expondremos a continuación, *confirmamos* la *Sentencia* apelada.

Número Identificador
SEN2024_____

**I.**

Los hechos de este caso se remontan a la presentación de una solicitud de permiso de uso por parte de Oiltec Eco Logistic, LLC. (en adelante, "Oiltec" o el "Apelado") ante la Oficina de Permisos del Municipio Autónomo de Caguas (en adelante, "OPMAC"), para el desarrollo de una facilidad dedicada al reciclaje de grasas, desperdicios sólidos no peligrosos que se producen en restaurantes y se recogen en trampas de grasa. El Permiso de Uso Único fue emitido por la OPMAC el 9 de octubre de 2021, bajo el número 2020-349110-PU-093381, el cual indica "Tipo de Permiso Único: Nuevo".[1] Así las cosas, el 2 de febrero de 2022, la OPMAC expidió un Permiso de Uso Único, bajo el número 2020-349110-PU-123848, que indica "Tipo de Permiso Único: Conversión" con la siguiente descripción del proyecto:

> [O]peración de transbordo y procesamiento de desperdicios sólidos y/o líquidos no peligrosos (aceite vegetal usado, grasa marrón, trampas de grasa, aguas de compañías lecheras, leche descartada, desperdicios de cerveceras, aguas de contacto, otros[)].[2]

Es menester destacar que este permiso constituyó una renovación del Permiso de Uso Único Nuevo previamente emitido por la OPMAC. Posteriormente, el 3 de julio de 2023, la OPMAC expidió un Permiso de Uso Único, bajo el número 2020-349110-PU-203838, que indica "Tipo de Permiso Único: Renovación", con la misma descripción del proyecto utilizada en el Permiso Único anterior sobre Conversión.[3] El legajo apelativo ante nos refleja que el anterior proceso de permiso contaba con una *Certificación de Cumplimiento Ambiental por Exclusión Categórica* expedida por la Oficina de Gerencia de Permisos (en adelante, "OGPe") el 29 de junio de 2021, bajo el caso 2020-349110-DEC-096754.[4] Debemos destacar que Oiltec opera en una estructura existente ubicada en un distrito bajo la clasificación de operación Industrial Liviana (I-L) y que los tres (3)

---

[1] V*éase,* Permiso Único Nuevo, Apéndice pág. 1135.
[2] V*éase,* Permiso Único Conversión, Apéndice pág. 1144.
[3] V*éase,* Permiso Único Renovación, Apéndice pág. 1153.
[4] V*éase,* Certificación de Cumplimiento Ambiental por Exclusión Categórica, Apéndice pág. 1162.

permisos indican que el tipo de uso autorizado corresponde a Industrial Liviana.

El 2 de febrero de 2024, la OPMAC presentó una demanda intitulada "**Petición para el Cese y Desista**" en contra de Oiltec, al amparo de las disposiciones de la Ley Núm. 161-2009, según enmendada, conocida como la "Ley para la Reforma del Proceso de Permisos de Puerto Rico", *infra*, (en adelante, "Ley Núm. 161-2009"). Mediante la misma, alegó que el Apelado incurrió en violaciones a las disposiciones del Código de Orden Público del Municipio Autónomo de Caguas (en adelante, el "COP del MAC").

Específicamente, aludió a que Oiltec llevó a cabo las siguientes conductas:

> [R]ealizó y realiza actividades clandestinas de disposición de aguas usadas y tóxicas, aceites usados y jabones industriales en detrimento al ambiente, los recursos naturales y los vecinos del sector en que ubica su operación industrial – sin el correspondiente cuidado y sin observar el cumplimiento básico con las leyes ambientales de Puerto Rico y las disposiciones del Código de Orden Público de la ciudad de Caguas.[5]

Sostuvo que por dichos incumplimientos la Policía Municipal de Caguas, según las recomendaciones del Sr. José Ortiz Mangual (en adelante, el "señor Ortiz Mangual"), emitió multas administrativas en tres (3) fechas distintas a Oiltec por la cantidad de $1,000.00 cada una. Dichas multas se basaron en alegadas descargas de aceites y jabones industriales, así como filtraciones de pozos sépticos que presuntamente llegaron al sistema pluvial y, por consiguiente, a los cauces de la quebrada Janer y Río Grande de Loíza. Abundó que dicha situación generó una emergencia ambiental ante los daños causados a los recursos naturales.

Por lo anterior, la OPMAC solicitó del TPI, entre otras cosas, que: (1) ordene el cese y desista de la operación industrial que realiza Oiltec; (2) revoque el Permiso de Uso emitido por la OPMAC bajo el caso 2020-349110-PU-203838; (3) ordene el pago de las multas administrativas

---

[5] *Véase,* Petición para el Cese y Desista Enmendada, Apéndice pág. 968.

impuestas por la Policía del Municipio de Caguas; y (4) que imponga una cantidad ascendente a $2,000.00, por concepto de honorarios de abogado.

El 8 de febrero de 2024, el Apelante presentó una "**Petición para el Cese y Desista - Enmendada**" mediante la cual añadió que en la solicitud de renovación del Permiso Único bajo el caso 2020-349110-PU-093381, Oiltec utilizó información incorrecta o falsa para obtener dicha renovación bajo el Permiso Único 2020-349110-PU-123848. Además, argumentó que la renovación del Permiso Único 2020-349110-PU-123848 no procedía como renovación, ya que el Apelado incluyó actividades adicionales a las originales establecidas en el Permiso Único Original que requerían la solicitud de un Permiso de Uso y no una renovación. Explicó que las nuevas actividades incluidas por el Apelado en la solicitud de renovación del Permiso Único Original, además de requerir la solicitud y evaluación de un Permiso de Uso Único Nuevo, requería unas evaluaciones ambientales de mayor rango y complejidad por parte de las agencias de manejo de impacto ambiental.

Luego de varios trámites procesales, se señaló la vista de interdicto preliminar para el 16 de febrero de 2024, en la cual el Apelante presentó su prueba testifical que incluyó los testimonios del señor Ortiz Mangual y dos policías del MAC, Alfredo Ortiz del Valle y Ángel Hernández Núñez (en adelante, el "Agt. Hernández Núñez"). La vista de interdicto preliminar se extendió hasta el 23 de febrero de 2024, con la continuación de la presentación de los testigos del Apelante, que incluyó los testimonios del planificador Guillermo Rivera Cruz y la ingeniera Eileen Rodríguez Vélez. Sometida la prueba por el Apelante, Oiltec presentó una solicitud de desestimación, al amparo de las disposiciones de la Regla 39.2 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 39.2, basándose en que el MAC no pudo demostrar que las alegadas descargas ilegales hayan sido por actuaciones de Oiltec, ni que se demostrara que las mismas contenían contaminantes porque no se efectuaron los ejercicios de inspección y pruebas. Además, argumentó que no se estableció cómo Oiltec indujo a error a la OPMAC al momento de otorgar la renovación del Permiso único

original. El TPI se reservó su determinación respecto a dicha moción y señaló la continuación de la vista para el 27 de febrero de 2024. Llegado el día, el foro primario declaró "No Ha Lugar" la solicitud de desestimación y ordenó la continuación de los procedimientos.

Así pues, procedió a escuchar la prueba testifical presentada por parte del Apelado, que incluyó los testimonios del ingeniero Guillermo Burgos Zamaral (en adelante, el "Ing. Burgos Zamaral") y del Sr. Carlos Valdez (en adelante, el "señor Valdez"). El Ing. Burgos Zamaral fue cualificado como perito en el área de ingeniería civil y sobre los trámites de permisos relacionados al desarrollo de obras. Finalmente, el Apelante presentó como testigo de refutación al Sr. Evangelio Nieves González, quien es vecino colindante del predio donde ubican las facilidades de Oiltec.

La prueba documental presentada en las vistas y estipulada por ambas partes, fue acogida por el foro primario. Dicha prueba consistió en doce (12) documentos que incluyen los siguientes:

Exhibit 1 Certificación de Cumplimiento Ambiental por Exclusión Categórica – 9 de marzo de 2021.

Exhibit 2 Certificación de Cumplimiento Ambiental por Exclusión Categórica – 29 de junio de 2021.

Exhibit 3 Permiso Único – 9-10-2021.

Exhibit 4 Permiso Único – 02-02-2022.

Exhibit 5 Permiso Único – 03-07-2023.

Exhibit 6A Permiso Temporal 5 – 10-oct-2023.

Exhibit 6B Permiso Temporal - 31 ene-2023.

Exhibit 6C Permiso Temporal – 30 ago-2023.

Exhibit 7 Stormwater Management Program – 26- junio-2018.

Exhibit 8 National Polutant Discharge Eliminatios System (NPDES).

Exhibit 9 Petición Certificación Uso Facilidades Oiltec Eco Logistics – 17 – dic- 2020.

Exhibit 10 Orden Administrativa Número 2021-02 del 28 de enero de 2021.

Exhibit 11 Orden Administrativa OGP 2021-06 del 29 de octubre de 2021.

Exhibit 12 Memorial Explicativo para Autorizar Uso en Estructura Existente.

Luego de la celebración de las tres (3) vistas, y a solicitud del foro de instancia, ambas partes presentaron memorandos de derecho. Tras evaluar y aquilatar la prueba admitida, el 18 de abril de 2024, el TPI emitió *Sentencia* mediante la cual declaró "No Ha Lugar" la "**Demanda**" presentada por el Apelante y, en su consecuencia, desestimó la misma. En específico, el foro de instancia concluyó que el Apelado demostró que no indujo a error a la OPMAC al solicitar la renovación de su permiso único al expresar lo siguiente:

> Surge de las disposiciones del RC-2023, así como del Reglamento Núm. 5717, supra, que Oiltec es un centro para manejar materiales reciclables, desperdicios sólidos no peligrosos, y que, cónsono con las definiciones de ambos cuerpos reglamentarios, el trasbordo queda contemplado como inherente a la operación de la instalación para el manejo de los desperdicios sólidos.[6]

Asimismo, el TPI entendió que Oiltec demostró con su prueba testifical y documental que no añadió usos nuevos y que la operación del negocio es la misma desde su origen. En consecuencia, determinó que el Permiso de Uso que ostenta el Apelado es completamente válido y goza de la presunción de corrección y certeza al ser uno final y firme. Por otra parte, resolvió que los trámites efectuados por Oiltec para la renovación de su Permiso de Uso fue el correcto y se ajustó íntegramente a lo establecido por la Oficina de Gerencia de Permisos en su Orden Administrativa OA-2021-06. Finalmente, el foro primario concluyó que el Apelante no presentó prueba *prima facie* para demostrar que Oiltec haya realizado las alegadas descargas ilegales o violaciones a alguna disposición o condición de sus permisos.

El 30 de abril de 2024, el OPMAC presentó una "**Solicitud Determinaciones de Hechos Adicionales y de Reconsideración**", la cual fue declarada "No Ha Lugar" por el TPI mediante *Resolución* de 24 de mayo de 2024. Aún inconforme con lo anteriormente resuelto, el MAC acudió ante este Tribunal mediante el recurso de epígrafe, en el que señaló los siguientes errores:

> PRIMER ERROR: Erró el TPI al emitir una sentencia contraria a derecho[,] toda vez que existen violaciones del Código de

---

[6] V*éase,* Sentencia, Apéndice pág. 2.

Orden Público que advinieron finales y firmes e inapelables[,] lo que representa abuso de discreción.

SEGUNDO ERROR: Erró el TPI al emitir una sentencia que tiene como consecuencia autorizar actividades con impacto ambiental significativo que no han sido evaluadas en el proceso de permisos y requieren la paralización de las actividades hasta que se pase juicio sobre ellas[,] lo que representa abuso de discreción.

Así las cosas, mediante *Resolución* emitida el 25 de junio de 2024 por este Tribunal, le concedimos al Apelado un término para presentar objeciones a la transcripción de la prueba oral (en adelante, "TPO") y/o si estipulaba la misma. Sin embargo, dimos por estipulada la TPO, ya que el Apelado no presentó objeciones ni estipuló la misma. Por otro lado, el 8 de julio de 2024, el Apelante presentó una "**Solicitud Urgente de Auxilio de Jurisdicción y Orden de Paralización de Actividades**". Mediante *Resolución* de 9 de julio de 2024 declaramos "No Ha Lugar" la solicitud de paralización de los procedimientos.

El 22 de agosto de 2024, Oiltec presentó "**Alegato de la Parte Apelada**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

La Regla 57 de Procedimiento Civil, 32 LPRA Ap. V, R. 57, y los Arts. 675 al 687 del Código de Enjuiciamiento Civil, 32 LPRA secs. 3421 al 3533, respectivamente, regulan el recurso de *injunction* o interdicto. Adoptado del sistema de equidad inglés, este recurso extraordinario se utiliza para prohibir u ordenar la ejecución de determinado acto con el fin de evitar causar perjuicios inminentes o daños irreparables a alguna persona, en aquellos casos en que no hay otro remedio adecuado en ley para obtener ese resultado. Senado de Puerto Rico v. Gobierno de Puerto Rico, 203 DPR 62, 71 (2019); E.L.A. v. Asociación de Auditores, 147 DPR 669, 679 (1999). Nuestro ordenamiento jurídico reconoce tres (3) modalidades de *injunction*, éstos son: el *injunction* permanente, *injunction* preliminar y el entredicho provisional.

El Tribunal Supremo reiteradamente ha señalado que los tribunales antes de expedir un *injunction*, ya sea preliminar o permanente, deben considerar si existe algún otro remedio eficaz, completo y adecuado en ley. De ser así, entonces no se considerará el daño como irreparable. Pérez Vda. Muñiz v. Criado, 151 DPR 355, 372 (2000). En consonancia con lo anterior, se ha establecido que se estiman como remedios legales adecuados aquellos que pueden otorgarse en una acción por daños y perjuicios, en una criminal o cualquiera otra disponible. Misión Industrial v. J.P. y A.A.A., 142 DPR 656, 681 (1997).

El daño irreparable que justifica la expedición de este remedio extraordinario del *injunction* es aquel que no puede ser remediado mediante la utilización de otros medios legales disponibles y que no puede ser apreciado con certeza, ni debidamente compensado por cualquier indemnización que pudiera recobrarse en un pleito ordinario. Es por ello que, como recurso extraordinario, su concesión recae en la entera discreción del juez. Pérez Vda. de Muñiz v. Criado Amunategui, 151 DPR 355, 372 (2000).

Por su parte, el *injunction* preliminar se emite en cualquier momento antes del juicio en su fondo. En la mayoría de los casos, se solicita junto a la presentación del pleito y, en caso de urgencia, se le solicita al tribunal el señalamiento de una vista para discutir los méritos de dicha petición. D. Rivé Rivera, Recursos Extraordinarios, 2da ed. rev., Programa de Educación Jurídica Continuada, Facultad de Derecho Universidad Interamericana de Puerto Rico, 1996, San Juan, pág. 21. El propósito de este recuso es mantener el *estatus quo* hasta que se celebre el juicio en sus méritos para que así no se produzca una situación que convierta en académica la sentencia que finalmente se dicte al atender la petición de *injunction permanente* o se le ocasionen daños de mayor consideración al peticionario mientras perdura el litigio. VDE Corp. v. F&R Contractors, 180 DPR 21, 41 (2010); Rullán v. Fas Alzamora, 166 DPR 742, 764 (2006). Para poder expedir este tipo de remedio, el tribunal debe citar a una vista, previa notificación y su vigencia será efectiva desde el momento en que se

notifica hasta que se decida, mediante sentencia, la permanencia o no de la solicitud.

Al momento de la expedición del *injunction* preliminar, el tribunal tomará en consideración cualquier cambio en las circunstancias presentes al momento en que se hizo la solicitud y aquéllas que prevalecen al momento en que se va a dictar la orden. Trigo Hnos. v. Sobrino Izquierdo, 72 DPR 449, 465 (1951); Las Monjas Racing Corp. v. Comisión Hípica, 57 DPR 522, 524 (1940). Ahora bien, en los casos en que se solicite un *injunction* preliminar y permanente, el tribunal está facultado para consolidar ambas vistas, sin que las partes tengan que presentar evidencia nuevamente. La emisión de una orden de *injunction* preliminar no necesariamente ata al tribunal a la hora de evaluar la expedición del interdicto permanente. Mun. De Loíza v. Sucn. Marcial Suárez, 154 DPR 333, 367 (2001).

De otra parte, al igual que en un *injunction* preliminar, el tribunal antes de emitir un interdicto permanente deberá celebrar una vista en sus méritos. Le corresponderá evaluar los siguientes criterios: (1) si el demandante ha prevalecido o puede prevalecer en un juicio en sus méritos; (2) si el demandante tiene algún otro remedio adecuado en ley o si el *injunction* es el único recurso disponible para vindicar su derecho; (3) el interés público presente o afectado por el pleito; y (4) el balance de equidades entre todas las partes en litigio. Senado de Puerto Rico v. Gobierno de Puerto Rico, *supra*, pág. 72. Este es un remedio interdictal que se produce mediante una sentencia final.

Mientras, el auto de entredicho provisional es un remedio de carácter interlocutorio que persigue mantener el *estatus quo* hasta tanto el tribunal adjudique la procedencia de una solicitud de *injunction* preliminar. Al ser expedido sin notificación previa al demandado y sin oportunidad para ser oído, la petición ha de ser juramentada o estar acompañada de declaración jurada y de ella deben surgir los motivos que justifican su concesión debido a que se causarán daños, perjuicios o pérdidas irreparables al peticionario antes de notificar y escuchar al demandado. Además, el solicitante está en

la obligación de certificar al tribunal las diligencias efectuadas para notificar a la parte adversa, si alguna, o las razones por las que entiende no procede la notificación previa. 32 LPRA Ap. V R. 57.1.

La orden de entredicho provisional que emita el tribunal debe cumplir con los requisitos de la Regla 57.4 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 57.4. Éstos son: (1) ser preciso en cuanto a lo que se prohíbe o exige hacer; (2) detallar por qué el daño es inminente, inmediato e irreparable; (3) explicar por qué se emitió sin notificación previa; e (4) incluir la cuantía de la fianza que se le requirió al demandante para que pueda responder por daños y costas en caso de que se haya expedido indebidamente. El Tribunal Supremo de Puerto Rico ha insistido en que antes de expedir el *injunction*, ya sea preliminar o permanente, los tribunales deben considerar la existencia de algún otro remedio eficaz, completo y adecuado en ley. De existir, entonces no se considerará el daño como irreparable. Pérez Vda. Muñiz v. Criado, *supra*, pág. 372 (2000); A.P.P.R. v. Tribunal Superior, 103 DPR 903, 908 (1975).

**B.**

La Ley Núm. 161-2009, según enmendada, conocida como la "Ley para la Reforma del Proceso de Permisos de Puerto Rico", 23 LPRA sec. 9011 *et seq.*, creó la OGPe, adscrita a la Junta de Planificación. 23 LPRA sec. 9012. Este estatuto le transfirió a la OGPe las funciones de la Administración de Reglamentos y Permisos y, por ende, le concedió jurisdicción para emitir permisos, recomendaciones, licencias o certificaciones relacionadas al desarrollo y el uso de terrenos en Puerto Rico. 23 LPRA secs. 9012s y 9018. Así pues, dicho estatuto estableció un esquema de evaluación y aprobación de permisos de construcción. A estos efectos, toda resolución aprobando un permiso de construcción puede ser objeto de revisión ante un ente administrativo.

La Ley Núm. 161-2009 también confiere a los tribunales de primera instancia, a manera de excepción, la facultad para resolver acciones que cuestionan permisos finales expedidos por la agencia. En dichos casos, dicha pieza legislativa expresamente obliga al tribunal a "presum[ir] la

corrección y la legalidad de las determinaciones finales y permisos expedidos". 23 LPRA sec. 9010i. No obstante, la ley le reconoce al tribunal de primera instancia la facultad de revocar un permiso de construcción o la determinación final de la agencia, siempre que medien ciertas circunstancias. Sobre esto, el Artículo 9.10 de la Ley 161-2009 dispone:

Se presume la corrección y la legalidad de las determinaciones finales y de los permisos expedidos por la Oficina de Gerencia de Permisos.… No obstante, **cuando medie fraude, dolo, engaño, extorsión, soborno o la comisión de algún otro delito en el otorgamiento o denegación de la determinación final o del permiso, o en aquellos casos en que la estructura represente un riesgo a la salud o la seguridad, a condiciones ambientales o arqueológicas, la determinación final emitida y el permiso otorgado por la Oficina de Gerencia de Permisos… deberá ser revocado**. La estructura se podrá modificar, conservar o demoler, sólo después de que un tribunal competente así lo determine y siguiendo con el procedimiento judicial establecido en las secs. 9024 a 9024e de este título, además de cumplir con el debido proceso de ley.

[…]

**De igual manera, tales permisos deberán ser sostenidos en su legalidad y corrección por las entidades gubernamentales concernidas frente a ataques de terceros. Cuando medie fraude, dolo, engaño, extorsión, soborno, o la comisión de algún delito en el otorgamiento del permiso**, o en aquellos casos en que la estructura represente un riesgo a la salud, la seguridad, a condiciones ambientales o arqueológicas, y sujeto a lo dispuesto en este capítulo, el permiso otorgado por la Oficina de Gerencia, por el Municipio Autónomo con Jerarquía de la I a la V o por el profesional autorizado, deberá ser revocado. La obra deberá ser modificada, conservada o demolida, sólo después de que el foro administrativo o judicial competente así lo determine y siguiendo con el procedimiento judicial establecido en las secs. 9024 a 9024e de este título, además de cumplir con el debido proceso de ley. 23 LPRA sec. 9019*i* (énfasis suplido).

Por otra parte, el Artículo 14.1 de la Ley Núm. 161-2009 permite la presentación de recursos ante los tribunales de primera instancia, bajo ciertos escenarios particulares. Además, establece los recursos extraordinarios para solicitar la revocación de permisos y/o la paralización de obras o usos no autorizados. A tales efectos, dicho artículo dispone en sus partes pertinentes:

La Junta de Planificación, así como cualquier Entidad Gubernamental Concernida, Municipio Autónomo con Jerarquía de la I a la V o cualquier otra dependencia o instrumentalidad del Gobierno de Puerto Rico en representación del interés público o una persona privada, natural o jurídica, que tenga un interés propietario o personal

que podría verse adversamente afectado, podrá presentar una acción de *injunction*, *mandamus*, sentencia declaratoria, o cualquier otra acción adecuada para solicitar: 1) la revocación de un permiso otorgado, cuya solicitud se haya hecho utilizando información incorrecta o falsa; 2) la paralización de una obra iniciada sin contar con las autorizaciones y permisos correspondientes, o incumpliendo con las disposiciones y condiciones del permiso otorgado; 3) **la paralización de un uso no autorizado**; 4) la demolición de obras construidas, que al momento de la presentación del recurso y al momento de adjudicar el mismo no cuenten con permiso de construcción, ya sea porque nunca se obtuvo o porque el mismo ha sido revocado.

Indistintamente de haberse presentado una querella administrativa ante la Junta de Planificación, Entidad Gubernamental Concernida, Municipio Autónomo con Jerarquía de la I a la V o cualquier otra dependencia o instrumentalidad del Gobierno de Puerto Rico, alegando los mismos hechos, una parte adversamente afectada podrá presentar un recurso extraordinario en el Tribunal de Primera Instancia. Una vez habiéndose presentado el recurso extraordinario al amparo del presente Artículo, la agencia administrativa perderá jurisdicción automáticamente sobre la querella y cualquier actuación que llevare a cabo con respecto a la misma será considerada ultra vires. 23 LPRA sec. 9024 (énfasis suplido).

El recurso anterior de *injunction* se conoce también como un interdicto estatutario.  Sobre el *injunction* estatutario, en Next Step Medical v. Bromedicon, 190 DPR 474 (2014), nuestro Tribunal Supremo aclaró que:

Debido a su naturaleza, el *injunction* estatutario es independiente del tradicional y, por consiguiente, generalmente exento de la normativa aplicable a este último. Ello, pues, hemos establecido que los requisitos del *injunction* tradicional son más rigurosos que los exigidos para el estatutario. Por lo tanto, a diferencia del interdicto tradicional, la concesión de un *injunction* estatutario requiere un tratamiento especial, enmarcado en un examen o escrutinio judicial más acotado. Íd., pág. 497 (citas omitidas).

El interdicto tradicional tiene su origen en la equidad y va dirigido esencialmente a atender situaciones donde no existe otro remedio adecuado en ley para atender los perjuicios que enfrenta una persona, mientras que el interdicto estatutario proviene de un mandato legislativo expreso.

Por lo anterior, el Tribunal explicó que, aunque los criterios rectores para la expedición del interdicto clásico no aplican estrictamente, dicha normativa sirve como guía para la expedición del remedio provisional. Íd., págs. 498-499.  En un análisis de la figura del interdicto estatutario bajo la Ley Núm. 76 del 24 de junio de 1975, según enmendada, conocida como

"Ley Orgánica de la Administración de Reglamentos y Permisos", 23 LPRA sec. 71 *et. seq.*, se establecieron las instancias en las que se puede conceder un interdicto estatutario, éstas son: 1) la existencia de una ley o reglamento que regula dicho uso o actividad; y (2) la persona o personas señaladas se encuentren realizando un uso o actividad en violación a esa ley o reglamento. A.R.Pe. v. Rivera, 159 DPR 429, 445 (2003). Asimismo, el Tribunal Supremo de Puerto Rico expresó que los interdictos estatutarios y procedimientos especiales como el dispuesto en el Art. 14.1 de la Ley Núm. 161-2009, se caracterizan por ser mecanismos estatutarios, especiales y sumarios, limitados a la obtención de órdenes para la paralización inmediata, provisional o permanente de usos contrarios a la ley. Íd., págs. 443-444; A.R.Pe. v. Rodríguez, 127 DPR 793, 807-808 (1991).

## C.

Es norma conocida en nuestro ordenamiento jurídico que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia. Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co., 209 DPR 759, 779 (2022). Al respecto, la Regla 42.2 de las Reglas de Procedimiento Civil dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". 32 LPRA Ap. V, R. 42.2.

Es decir, un tribunal apelativo no tiene facultad de sustituir por sus propias apreciaciones las determinaciones del foro de instancia. Serrano v. Auxilio Mutuo, 171 DPR 717, 741 (2007). La razón jurídica detrás de esta normativa se fundamenta en la apreciación que hace el adjudicador de los hechos de la prueba testifical, porque al ser una tarea llena de elementos subjetivos, es él quien está en mejor posición para aquilatarla. Sucn. Rosado v. Acevedo Marrero, 196 DPR 884, 917 (2016). El Tribunal de

Primera Instancia es el foro que tiene la oportunidad de escuchar el testimonio y apreciar el comportamiento de los testigos. Dávila Nieves v. Meléndez Marín, 187 DPR 750, 771 (2013). Basándose en ello, adjudica la credibilidad que le merecen los testimonios. Así, la declaración directa de un sólo testigo, de ser creída por el juzgador de hechos, es prueba suficiente de cualquier hecho. SLG Rivera Carrasquillo v. AAA, 177 DPR 345, 357 (2009).

A tenor con lo anterior, se le concede respeto a la adjudicación de credibilidad realizada por el juzgador primario de los hechos, dado que el foro apelativo cuenta solamente con "récords mudos e inexpresivos". Trinidad v. Chade, 153 DPR 280, 289 (2001). No obstante, la norma de deferencia judicial tiene límites y no supone una inmunidad absoluta frente a la función de los tribunales revisores. El Tribunal Supremo aclaró en Dávila Nieves v. Meléndez Marín, *supra*, por primera vez, qué constituye que un juez adjudique con pasión, prejuicio o parcialidad, o que su determinación sea un error manifiesto. Allí se concluyó que un juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". Íd., pág. 782.

Por otro lado, se consideran claramente erróneas las conclusiones del foro revisado si de un análisis de la totalidad de la evidencia, el foro apelativo queda convencido de que "se cometió un error, […] [porque] las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". Íd., pág. 772. En otras palabras, incurre en un error manifiesto cuando "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". Pueblo v. Toro Martínez, 200 DPR 834, 859 (2018).

Por lo tanto, la facultad de los tribunales apelativos para sustituir el criterio de los tribunales de instancia se reduce a aquellas circunstancias en las que, a la luz de la prueba admitida, "no exista base suficiente que

apoye su determinación". <u>Gómez Márquez *et al*. v. El Oriental</u>, 203 DPR 783, 794 (2020). Como es conocido, las diferencias de criterio jurídico no cumplen con el referido estándar de revisión. <u>Íd</u>.

**D.**

Recientemente, se aprobó en nuestra jurisdicción la Ley Núm. 107-2020, según enmendada, conocida como el "Código Municipal de Puerto Rico". Conforme la exposición de motivos, dicha pieza legislativa se aprobó con el fin ulterior de atender las necesidades de los gobiernos de los ayuntamientos mediante el establecimiento de una estructura municipal adaptada a los tiempos modernos, para que se renueven y busquen alternativas reales ante el nuevo escenario mundial al que se enfrentan. Así pues, el Artículo 1.003 del Código Municipal dispone para la transferencia de poderes y facultades del Gobierno Estatal, con miras a que se puedan atender las necesidades de cada municipio en Puerto Rico. 21 LPRA sec. 7003. De conformidad con lo anterior, se instituyó expresamente la autonomía municipal como el ejercicio de los poderes jurídicos, económicos y administrativos sobre asuntos relacionados con el bienestar general de los habitantes. 21 LPRA sec. 7012.

Con ello en mente, se facultó a los ayuntamientos a crear la reglamentación necesaria para la implementación y administración de los planes de ordenación territorial. "En asuntos de su competencia, el municipio coordinará con las agencias públicas concernidas un proceso dirigido a armonizar sus planes en el área municipal, con los planes y programas de dichas agencias de forma mutuamente satisfactoria". Art. 6.014 del Código Municipal, 21 LPRA sec. 7864. Por ello, el proceso de elaboración y adopción de los planes de ordenación se deberá efectuar en colaboración con la Junta de Planificación de Puerto Rico. <u>Íd</u>.

Cónsono con lo anterior, "[e]l municipio podrá, siguiendo el procedimiento y las normas establecidas en este Capítulo, solicitar al Gobernador la transferencia de ciertas facultades de la Junta de Planificación y de la OGPe, sobre la ordenación territorial, incluyendo querellas, autorizaciones y permisos". Art. 6015 del Código Municipal, 21

LPRA sec. 7865. Dicha transferencia de poderes de ordenación territorial del Gobierno Estatal a los municipios se constituye como un proceso riguroso que requiere una serie de autorizaciones y el cumplimiento de un conjunto de criterios jurídicos y procesales. Íd. Ahora bien, el convenio de transferencia de facultades establecerá limitaciones en los poderes delegados a los municipios, dependiendo de la capacidad de este último. Íd. "**Al transferir una facultad se transferirá además la facultad de atender, denunciar, resolver y procesar las querellas y violaciones relacionadas a dicha facultad**". Íd., inciso (e) (énfasis suplido).

Es menester señalar que, conforme al Artículo 6.015 del Código Municipal, la transferencia de facultades a las que hemos hecho referencia se realiza mediante un mecanismo de clasificaciones denominadas "jerarquías", que van de la I hasta la III de acuerdo con el nivel de complejidad y la capacidad del municipio para asumirlas. 21 LPRA sec. 7865. Nótese que la delegación dispuesta en dicha pieza legislativa está fundamentada en el hecho de que no todos los municipios están preparados para asumir todas las responsabilidades que se derivaban de dichas jerarquías. "Una vez transferida la facultad de otorgar permisos, el municipio asumirá toda responsabilidad de las acciones tomadas en el ejercicio de esa facultad". Íd., inciso (g).

En lo pertinente al caso de autos, el Artículo 6.020 establece que:

La transferencia a un municipio de las facultades de la Junta de Planificación y de la Oficina de Gerencia de Permisos, conforme a lo establecido en el Artículo 6.015 de este Código, **conllevará la transferencia de todas las facultades legales que tienen dichas agencias para promover el cumplimiento e implementación de la reglamentación vigente sobre el uso del suelo**. **El municipio estará autorizado a incoar los recursos legales concernidos, representado por el Alcalde o por cualquier funcionario designado por éste para atender, denunciar, procesar y resolver las querellas sobre las violaciones de uso y construcción relacionadas con las facultades o competencias transferidas**. 21 LPRA sec. 7870 (énfasis suplido).

Por otra parte, el Código Municipal de Puerto Rico le confiere la facultad a los municipios para aprobar y poner en vigor ordenanzas con sanciones penales y administrativas. Así pues, el Artículo 1.009 de dicha pieza legislativa establece que:

En el ejercicio de sus facultades para reglamentar, investigar, emitir decisiones, certificados, permisos, endosos y concesiones, el municipio podrá imponer y cobrar multas administrativas de hasta un máximo de cinco mil (5,000) dólares por infracciones a sus ordenanzas, resoluciones y reglamentos de aplicación general, conforme se establezca por ley u ordenanza.

**El municipio deberá adoptar mediante ordenanza un procedimiento uniforme para la imposición de multas administrativas que contenga las garantías del debido procedimiento de ley en su vertiente sustantiva, similar al establecido en la Ley 38-2017, según enmendada, conocida como "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico"**. En aquellos municipios donde existan Tribunales Administrativos, estos tendrán jurisdicción primaria para revisar las multas administrativas aquí indicadas. Las decisiones emitidas por los Tribunales Administrativos podrán ser revisadas por el Tribunal de Primera Instancia. El Tribunal de Primera Instancia tendrá jurisdicción para conocer y resolver sobre cualquier violación a las ordenanzas que incluyan sanciones penales de los municipios. En los otros casos, el Tribunal de Primera Instancia entenderá en toda solicitud de revisión judicial de cualquier persona adversamente afectada por una orden o resolución municipal imponiendo una multa administrativa. 21 LPRA sec. 7014 (énfasis suplido).

Por ende, se desprende del Código Municipal de Puerto Rico que los ayuntamientos tienen la facultad de imponer y cobrar multas por infracciones a las normas instituidas por éstos. Cónsono con lo anterior, el MAC aprobó su Código de Orden Público. De conformidad con el Artículo 4.005 (B) del Libro de Seguridad y Protección Pública de Caguas (en adelante, "Libro de Seguridad y Protección Pública") del Código de Orden Público, "[s]e autoriza a los agentes del orden público, funcionarios y empleados públicos autorizados por ley u ordenanza a expedir boletos imponiendo multas administrativas a toda persona que incurra en infracción a los Capítulos 2 y 3". Cónsono con ello, el Artículo 4.006 del Código de Orden Público dispone que los boletos expedidos deben contener los siguientes datos:

1. El nombre y la firma del agente del orden público, vigilante urbano o concesionario autorizado expedir multas administrativas y el número de placa o número de empleado.
2. La fecha y hora en que ocurrió la violación o infracción.
3. Descripción de la falta imputada, incluyendo la disposición legal o artículo correspondiente.
4. Multa a pagarse.
**5. Lugar dónde pagar y alternativas de pago.**
**6. Alternativa de pagar la multa administrativa o de solicitar una vista administrativa para objetarla, dentro del término de treinta (30) días desde la fecha de expedición.**

**7. Su derecho a comparecer a la vista representado por un abogado**. Artículo 4.006 del Libro de Seguridad y Protección Pública, *supra* (énfasis suplido).

Asimismo, el Artículo 4.010 del Libro de Seguridad y Protección Pública establece que una parte adversamente afectada por una multa administrativa puede solicitar una vista administrativa para su revisión ante el Tribunal Administrativo o dependencia que indique el boleto dentro del término de treinta (30) días calendarios contados a partir de la fecha de su notificación. El inciso (c) del referido Artículo dispone que, si no se solicita la vista dentro de dicho período, la multa se convertirá en final e inapelable. Por su parte, el Código de Orden Público del MAC dispone las sanciones administrativas y penales por el incumplimiento con sus disposiciones. En lo pertinente al caso de epígrafe, el Artículo 3.064 de dicho cuerpo reglamentario establece la norma aplicable al incumplimiento con las condiciones establecidas en un permiso de uso. En específico, establece una multa administrativa de $1,000.00 por infracción, cuando se opera un establecimiento comercial incumpliendo con las condiciones establecidas en el permiso de uso.

**III.**

El MAC nos solicitó que revoquemos la *Sentencia* dictada por el TPI, pues entiende que la misma es contraria a derecho y tiene como consecuencia la autorización de actividades con impacto ambiental significativo. Así pues, nos corresponde determinar si, a la luz de la prueba presentada, procedía la expedición del *injunction* estatutario, al amparo del Artículo 14.1 de la Ley Núm. 161-2009, en contra de Oiltec por alegadas violaciones a las disposiciones del COP del Municipio, así como si el Permiso de Uso en controversia fue obtenido con información falsa o incorrecta. Veamos.

Comenzamos por adjudicar en los méritos el segundo señalamiento de error esgrimido. En esencia, el MAC sostiene que procedía la expedición del interdicto, de conformidad con la Ley Núm. 161-2009, *supra*, bajo el argumento de que las presuntas descargas atribuidas a Oiltec eran violaciones al COP y al Permiso de Uso expedido por la OPMAC.

Asimismo, plantea que se identificaron varias inconsistencias y defectos en los Permisos otorgados, consistentes en la operación de una estación de trasbordo que requería una nueva Certificación de Cumplimiento Ambiental por Exclusión Categórica.

De entrada, conviene recalcar la norma básica de derecho en nuestro ordenamiento, a los efectos de que la parte promovente de un litigio civil tiene el peso de demostrar su causa de acción mediante la presentación de prueba admisible a esos efectos. Así, si ese rigor evidenciario no se cumple, a la luz del estado de derecho aplicable, procede la denegatoria del remedio solicitado y/o la desestimación del pleito incoado.

Al analizar con detenimiento la TPO de la vista de *injunction* y examinar cautelosamente la prueba documental presentada por las partes, adelantamos que no procedía la expedición del *injunction* estatutario solicitado por el MAC. Nos explicamos.

El Artículo 14.1 de la Ley Núm. 161-2009, *supra*, ciertamente provee para la revocación de un permiso de uso otorgado cuando se haya solicitado utilizando información incorrecta o falsa. Lo anterior es precisamente unos de los planteamientos medulares esgrimidos por la OPMAC en contra de Oiltec. Durante las vistas celebradas, la OPMAC presentó los testimonios de dos (2) policías del Municipio de Caguas y a un especialista en asuntos ambientales de dicho ayuntamiento para sustentar sus alegaciones. Además, presentó el testimonio del planificador Guillermo Rivera Cruz y de la ingeniera Eileen Rodríguez Vélez. **Es de particular importancia apuntar que estos últimos testigos no fueron cualificados como peritos durante el procedimiento**.

Establecido lo anterior, cuando pasamos juicio sobre la prueba que presentó el MAC, surge que se omitieron realizar pruebas de las alegadas descargas en los predios donde ubica Oiltec para determinar que fueran contaminantes y que los mismos estaban vinculados a prácticas efectuadas por el Apelado. Tampoco se estableció que la OPMAC hubiera inspeccionado las propiedades que ubican a un nivel más elevado que la

propiedad de Oiltec, con el objetivo de determinar si el origen de las alegadas descargas les era atribuibles a éstas o a Oiltec, como alega el Apelante. Esto es, no se demostró que los contaminantes en cuestión fueran sustancias tóxicas y mucho menos que provinieran de descargas efectuadas por Oiltec.

**Lo anterior, claramente, representa un vacío insubsanable, puesto que la causa de acción del MAC se originó por unas presuntas descargas de contaminantes atribuidas a Oiltec y la prueba presentada por el promovente de la acción del interdicto estatutario que nos ocupa no demostró que, en efecto, era el Apelado el responsable de dichas descargas**. En suma, no existe un ápice de prueba que establezca, como mínimo, que las descargas que se pudieron visualizar eran contaminantes y que quien las estaba depositando en los cuerpos de agua lo era Oiltec. Simple y sencillamente, no se le presentó al juzgador de los hechos evidencia que cumpliera con el estándar probatorio necesario para estar en posición de conceder el remedio solicitado.

**Esto, a su vez, representa un problema mayor para el MAC, cuando lo que sí estableció la prueba fue que existían otras propiedades aledañas al establecimiento de Oiltec que, igualmente, pudieron ser los responsables únicos de las descargas o contribuir a las mismas. En fin, la prueba ni vinculó a Oiltec con las aludidas descargas, <u>ni descartó al restante de los dueños de los inmuebles contiguos como responsables de las mismas</u>**. **<u>Por tanto, estamos ante un caso en el que no se establecieron los elementos principales de la causa de acción iniciada por el MAC</u>**.

Por otro lado, el MAC sostiene que procedía la concesión del remedio solicitado, bajo el fundamento de que en el proceso de revisión de los permisos otorgados a Oiltec se percataron de varias inconsistencias y defectos en el proceso de otorgamiento de los mismos. Específicamente, alude a que el Apelado no sólo realizaba la operación de un Centro de Materiales Reciclables, sino que operaba una Estación de Transbordo desde el inicio, sin contar con una autorización a esos fines que requería

una *Certificación de Cumplimiento Ambiental por Exclusión Categórica.*
Veamos.

Recalcamos, cuando se solicita un *injunction* estatutario, el peso de la prueba recae sobre el promovente. Pérez Vda. Muñiz v. Criado, *supra*, pág. 373. Así pues, al existir el Permiso de Uso expedido por la OPMAC, le correspondía al MAC –como parte promovente del interdicto– presentar evidencia que rebatiera la presunción de corrección y legalidad de dicha autorización. Por ende, el Apelante tenía que probar que el permiso fue, en efecto, otorgado utilizando información falsa o incorrecta. Durante la vista de *injunction*, la OPMAC no logró evidenciar cuál fue esa información errónea o falsa que proveyó Oiltec en el proceso de aprobación del Permiso de Uso y que, en efecto, el Apelado operó una Estación de Transbordo desde el inicio, sin contar con una autorización a esos fines que requería una *Certificación de Cumplimiento Ambiental por Exclusión Categórica.*

Según nuestro examen, concluimos que el Apelante no presentó prueba suficiente para ser acreedor del remedio extraordinario del *injunction* dispuesto en la Ley Núm. 161-2009, *supra*. Examinada con detenimiento tanto la TPO como la evidencia presentada por las partes, entendemos que la OPMAC no pudo evidenciar con claridad la falsedad de la información proporcionada por Oiltec al momento de que se le otorgara el Permiso de Uso original. A todas luces, sus alegaciones no estuvieron debidamente respaldadas por la evidencia correspondiente. Sobre este respecto, conviene recordar que es norma conocida en nuestro ordenamiento jurídico que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el foro de instancia. Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co., *supra*.

Según se desprende del expediente, tenemos ante nuestra consideración planteamientos relativos a la apreciación de la prueba y tendentes a sugerir que las determinaciones de hechos no están sostenidas por la evidencia desfilada. En el caso de epígrafe, aunque

contamos con la transcripción de la prueba testifical, opinamos que el TPI no cometió error alguno al apreciar la evidencia desfilada y que sus conclusiones de derecho se ajustan a la prueba admitida durante la vista celebrada. En su consecuencia, no podemos descartar la apreciación del foro de instancia.

**En otras palabras, y según adelantado, estamos ante un panorama en el que contamos con simples alegaciones que no derrotan la presunción de corrección que cobija las determinaciones de hechos y conclusiones basadas en la prueba oral, ni la adjudicación de credibilidad que efectuó el foro primario, pues no existe prueba alguna tendente a establecer que las descargas fueron efectuadas por Oiltec ni evidencia que demuestre la alegada falsedad en el proceso de otorgamiento del Permiso de Uso original**. Por lo tanto, huérfano el expediente apelativo de evidencia específica tendente a establecer que el TPI actuó con pasión, prejuicio, parcialidad o error manifiesto, no estamos en condiciones de variar el dictamen apelado. No se cometió el error señalado.

Nuestra conclusión encuentra más fundamento en el hecho de que Oiltec presentó el testimonio pericial del ingeniero Burgos Zamaral, quien atestiguó que según su experiencia y tras la evaluación del expediente del caso, el Permiso de Uso original se otorgó correctamente y no se desprendía prueba sobre la presunta falsedad o ilegalidad en la información provista por el Apelado durante el proceso de aprobación. Además, la prueba estableció que Oiltec no añadió usos nuevos y que la operación del negocio es la misma desde su origen. Por lo tanto, su permiso de uso es completamente válido y goza de la presunción de corrección y certeza.

En lo concerniente al primer señalamiento de error, sostiene el MAC que el TPI erró al no determinar que procedía el pago de las multas impuestas a Oiltec. No nos convence su postura. Veamos.

Conforme hemos adelantado en los acápites anteriores, el Código Municipal de Puerto Rico les confiere a los ayuntamientos la imposición de multas administrativas por incumplimiento con los códigos de orden público

que se aprueben. 21 LPRA sec. 7014. **El proceso de imposición de estas sanciones administrativas debe asegurar el <u>cumplimiento de las garantías del debido proceso de ley en su vertiente sustantiva</u>**. Íd. Es norma conocida de que entre las garantías que le reconoce el debido proceso de ley a todo litigante, se encuentra el derecho a recibir una notificación adecuada de toda determinación que emita un foro adjudicativo, ya sea una agencia administrativa o los tribunales. <u>Vendrell López v. AEE</u>, 199 DPR 352, 375 (2017). Esto pues, una notificación insuficiente puede traer consigo consecuencias adversas a la sana administración de la justicia, además de que puede demorar innecesariamente los procedimientos administrativos y, posteriormente, los judiciales. <u>Olivo v. Srio. de Hacienda</u>, 164 DPR 165, 178 (2005).

En línea con lo anterior, para cumplir con el debido proceso de ley, el MAC dispuso que los boletos expedidos deben incluir la siguiente información: (1) el nombre y firma de agente del orden público, (2) fecha y hora de la infracción, (3) detalles de la infracción imputada, (4) cantidad a pagar, (5) lugar a pagar y opciones de pago, (6) alternativa de pagar la multa **o solicitar una vista administrativa dentro de treinta (30) días y el (7) derecho a asistir a la vista representado por un abogado.** Art. 4.006 del Libro de Seguridad y Protección Pública, *supra* (énfasis suplido).

Tras examinar detenidamente el expediente ante nuestra consideración, incluyendo los boletos expedidos por el MAC, hemos arribado a la conclusión de que no procede el pago de las multas objeto de esta controversia. Nótese que los referidos boletos contienen el nombre y firma del agente del orden público que los expidió, la fecha y hora en que ocurrió la alegada infracción, la cantidad a pagar y la descripción de la falta; más, sin embargo, no especifican el lugar ni los métodos de pago. Tampoco contienen las advertencias de que podían elegir entre pagar la multa o solicitar una vista administrativa para objetarlas, así como comparecer a la vista acompañado de un abogado.

Esto es, los boletos expedidos no cumplen con los requisitos mínimos del debido proceso de ley que impone la Ley de Procedimiento

Administrativo Uniforme, el Código Municipal y el Código de Orden Público adoptado por el ayuntamiento. Lo anterior significa que, al emitir los boletos, el agente del orden público no proporcionó una notificación adecuada, lo que a su vez implica una violación al debido proceso de ley de Oiltec. Realizar las correspondientes advertencias era crucial para una administración sana de la justicia y para prevenir retrasos innecesarios en los procesos judiciales. **Por consiguiente, las referidas multas son ineficaces, carecen de efecto jurídico y no se pueden cobrar como lo pretende el Municipio en el presente caso. Resolver lo contrario, conllevaría negarle a Oiltec su derecho constitucional a una notificación adecuada y completa**.

Nuestra conclusión es cónsona con la norma reiterada por nuestro Tribunal Supremo, a los efectos de que la correcta y oportuna notificación de una determinación, sea judicial o administrativa, es un requisito *sine qua non* para un ordenado sistema judicial. De lo contrario, se crearía una incertidumbre sobre cuándo comienzan los términos para incoar los remedios *post-dictamen*, entre otras graves consecuencias y demoras. Dávila Pollock *et al* v. R. F. Mortgage, 182 DPR 86, 94 (2011). En fin, no se cometió el error señalado.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, se *confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones